# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS,
## EASTERN DIVISION

ALI GADELHAK, on behalf )
of himself and all others similarly situated, )
)
Plaintiff, )          17-cv-1559
)
v. )          Hon. Edmond Chang
)
)
AT&T SERVICES, INC. )
)          JURY DEMAND
)
Defendant. )

**Plaintiff's Combined Response in Opposition to Defendant's Motion for Summary Judgment and Cross Motion for Partial Summary Judgment**

# TABLE OF CONTENTS

I.  Introduction ..................................................................................................................1

II.  Statement of Facts ........................................................................................................2

III.  The Statutory ATDS Definition Covers Systems that Autodial Stored Numbers ..............6

IV.  AT&T's System Satisfies Both Alternatives in the ATDS Definition ............................12

    A.  AT&T's System Autodials Stored Lists of Telephone Numbers ...........................12

    B.  AT&T's System Uses a Random Number Generator ..............................................13

V.  Fifteen Years of Precedent Establish that List-Based Dialing Systems are ATDSs .........13

VI.  *ACA International* Did not Vacate all of the FCC's Prior Orders ...................................15

    A.  ACA Int'l Did not Reject Plaintiff's Interpretation of the Statute ....................20

VII.  The Most Persuasive Authority Rejects AT&T's Interpretation of *ACA Int'l* .................21

VIII.  Conclusion ...................................................................................................................24

# <u>TABLE OF AUTHORITIES</u>

Cases

*ACA Int'l v. FCC*, 885 F.3d 687 (D.C. Cir. 2018) ..............................................................passim
*Ammons v. Ally Fin.*, 2018 U.S. Dist. LEXIS 108588 (M.D. Tenn. 2018) ..................................21
*Blow v. Bijora*, 855 F.3d 793 (7th Cir. 2017) ................................................................. 1, 6, 14, 15
*Campbell-Ewald v. Gomez*, 136 S. Ct. 663 (2016) ......................................................................6
*Cent. Bank, N.A. v. First Interstate Bank, N.A.*, 511 U.S. 164 (1994) ..........................................8
*Chickasaw Nation v. United States*, 534 U.S. 84 (2001) ......................................................11, 12
*Griffith v. Consumer Portfolio Serv., Inc.*, 838 F. Supp. 2d 723 (ND. Ill. 2011) .........................15
*Heard v. Nationstar Mortg. LLC*, 2018 U.S. Dist. LEXIS 143175 (N.D. Ala. August 22, 2018) ..7
*Herrick v. GoDaddy.com, LLC*, 2018 U.S. Dist. LEXIS 83744 (D. Ariz. 2018) ........................22
*Illinois C. G. R. Co. v. Interstate Commerce Com.*, 720 F.2d 958 (7th Cir. 1983) ......................16
*In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 30 FCC Rcd. 7961
     (July 10, 2015) ...................................................................................... 13, 15, 17, 18
*Legg v. Voice Media Group, Inc.*, 20 F. Supp. 3d 1370 (S.D. Fla. 2014) ....................................15
*Maddox v. CBE Grp.*, 2018 U.S. Dist. LEXIS 88568 (N.D. Ga. 2018)........................................21
*Marks v. Crunch San Diego, LLC*, 2018 U.S App. LEXIS 26883 (9th Cir. September 20, 2018) .7,
     8, 9
*Marshall v. CBE Group, Inc.*, 2018 U.S. Dist. LEXIS 55223 (D. Nev. 2018) ............................22
*McMillion v. Rash Curtis & Assocs.*, 2018 U.S. Dist. LEXIS 101700 (N.D. Cal. 2018).............21
*Natural Res. Def. Council v. NRC*, 215 U.S. App. D.C. 32, 666 F.2d 595 (D.C. Cir. 1981)........16
*O'Shea v. Am. Solar Sol.*, 2018 U.S. Dist. LEXIS 110402 (S.D. Cal. 2018)...............................21
*Pieterson v. Wells Fargo Bank, N.A.*, 2018 U.S. Dist. LEXIS 113125 (N.D. Cal. 2018) ............21
*Ramos v. Hopele of Fort Lauderdale, LLC*, 2018 U.S. Dist. LEXIS 139947 (S.D. Fla. 2018) ....21
*Reyes v. BCA Fin. Servs.*, 2018 U.S. Dist. LEXIS 80690 (S.D. Fla. 2018) .............. 16, 20, 21, 22
*Sessions v. Barclays Bank Del.*, 2018 U.S. Dist. LEXIS 108453 (N.D. Ga. 2018).....................23
*Soppet v. Enhanced Recovery Co., LLC*, 679 F.3d 637 (7th Cir. 2012) .......................................10
*Swaney v. Regions Bank*, 2018 U.S. Dist. LEXIS 85217 (N.D. Ala. 2018)................................21
*United States v. Natour*, 700 F.3d 962 (7th Cir. 2012) ...............................................................12

Statutes

28 U.S.C. § 2342.............................................................................................................................15
28 USCS § 2344 .............................................................................................................................15
47 U.S.C. § 227(b)(1)(A)(iii)........................................................................................................8, 9
47 U.S.C. 227(a)(1)...........................................................................................................................6

Other Authorities

House Report 102-317 .....................................................................................................................10
*In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 18
     FCC Rcd 14014 (July 3, 2003) ...................................................................................1, 14, 20
*In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 18
     FCC Rcd. 14014, 14090-93, ¶¶129-33 (2003) ....................................................................13
*In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 23
     FCC Rcd 559 (January 4, 2008) ........................................................................ 1, 13, 14, 20

*In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 27 FCC Rcd. 13615 (October 17, 2012) ..............................................................................passim

Pursuant to Fed R. Civ. P. 56, Plaintiff Ali Gadelhak ("Plaintiff") responds in opposition to Defendant AT&T Services, Inc.'s ("Defendant's" or "AT&T's") Motion for Summary Judgment (*see Doc. 50*) and cross-moves for Partial Summary Judgment on the same issue.[1]  In support, Plaintiff states:

## I.    Introduction

AT&T's motion for summary judgment advances a single argument – it contends that the dialing system it used to send 7,000,000 automated survey text messages a month (or 233,333 a day) is not an Automatic Telephone Dialing System (ATDS) regulated by the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227 et seq.  This single argument also has a single premise – that the D.C. Circuit's opinion in *ACA Int'l v. FCC*, 885 F.3d 687 (D.C. Cir Mar. 16, 2018), which invalidated a portion of a 2015 FCC Order, also invalidates Seventh Circuit precedent that would otherwise doom AT&T's motion[2], and all of the FCC's prior orders holding that list-based dialing systems such as those used by AT&T here are ATDSs.[3]  As shown below, *ACA Int'l* does no such thing.  Further, it is somewhat of an academic issue because AT&T's dialing system satisfies the statutory ATDS definition under the plain language of the statute, even in the absence of any FCC guidance, so AT&T's motion fails in any case.  The Court should deny AT&T's motion and grant partial summary judgment in favor of Plaintiff because the dialing

---

[1]    Although Plaintiff seeks class certification, Plaintiff cross-moves for partial summary judgment now because AT&T expressly waived any objection to class certification based on the One Way Intervention doctrine. *Doc. 48.*

[2]    *See Blow v. Bijora*, 855 F.3d 793 (7th Cir. 2017) (denying the defendant's motion for summary judgment regarding a similar automated text messaging platform)

[3]    *See In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 18 FCC Rcd. 14014 (July 3, 2003) ("2003 Order"); *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 23 FCC Rcd. 559 (January 4, 2008) ("2008 Order"); *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 27 FCC Rcd. 13615 (October 17, 2012) ("2012 Order").

system at issue is an ATDS as a matter of law.

## II.     Statement of Facts

On July 15, 2016, at 10:11:35 am, Plaintiff received the following automated text message,

from short code 362-673, on his cellular telephone number, xx-xxx-9978:

> "Gracias por llamar a AT&T. En breve recibira unos mensajes para opinar acerca de su
> llamada."

*Counter Statement of Material Facts (CSMF)* at ¶¶ 29, 36-37.  Plaintiff was not a customer of

AT&T or any AT&T affiliated business at the time and did not respond to the message.  *Id.* at ¶

38.  Plaintiff had registered that number on the National Do-Not-Call list two years prior. *Id.* at ¶

39. Approximately sixteen minutes after the first message, Plaintiff received a second automated

text message from the same short code:

> "Cuan probable recomendaria los sericios de AT&T a un amigo o familiar en una escala
> del 10 al 1?"

*Id.* at ¶ 29.

Plaintiff responded to this second message by texting "Who is this" at 10:30:32 am. *Id.* at

¶ 30.  Less than one second later, Plaintiff received a third automated text message from the same

short code rather than a response to his question:

> "Gracias. Cuan satisfecho esta con el manejo general de la llamada po Catherine Miche en
> escala del 10 al 1? 10 = muy satisfecho a 1 = muy insatisfacho"

*Id.* at ¶ 31.  Plaintiff responded again by texting "Please tell me who this is.  I do not speak

Spanish." *Id.* at ¶ 32.  Less than one second later, Plaintiff received a fourth automated text message

from the same short code rather than a response to his question:

> "Gracias. Cuantas veces tuvo que contactar AT&T para resolver su solicitud? 1. Uno 2.
> Mas de uno 3. Todavia no se ha resuelto"

*Id.* at ¶ 33.

Plaintiff responded again by texting "Stop sending me messages." *Id.* at ¶ 29. Less than one second later, Plaintiff received a fifth automated text message from the same short code:

> Recivido: listed a optado no completar la encuesta hoy. Conteste "STOP ALL" para optar no recibir mas information o contactos de AT&T. Gracias.

*Id.* at ¶ 35.

These automated text messages were sent by The AT&T Customer Rules Feedback Tool (TACRFT), a telephone dialing protocol designed by AT&T to send automated survey text messages regarding AT&T's affiliates. *Id.* at ¶ 5. TACRFT is managed by AT&T's Market Research Organization. *Id.* It sends approximately 7,000,000 automated survey text messages per month. *Id.* at ¶ 28.

The particular automated text messages that Plaintiff received on July 15, 2016, were sent pursuant to a 2016 "Measurement Plan." *Id.* at ¶ 6. To implement that Measurement Plan, AT&T's computer systems were programed to automatically initiate a TACRFT survey whenever any customer service interaction occurred on a combined billing account where the customer subscribed to AT&T affiliates DirecTV and either Uverse or AT&T Mobility. *Id.*

AT&T testified that it does not know it obtained Plaintiff's telephone number, or how it documented the telephone number in its records. *Id.* at ¶ 40. AT&T testified further that it does not know what interaction triggered the survey messages to be sent to Plaintiff, or why its computer systems chose Plaintiff's number as opposed to any other telephone number in the account record to receive the messages. *Id.* at ¶ 41. Yet, it is undisputed that at some point, AT&T sent the above texts to Plaintiff. *See AT&T's Statement of Facts* at ¶ 8.

The TACRFT system works as follows. On an hourly basis, computer systems for each of these AT&T affiliates automatically identified accounts with qualifying interactions, and sent an electronic list of the various telephone numbers associated with those accounts, known as the

"Gross Sample" list, to the Market Research Organization. *Id.* at ¶¶ 7, 9. That list was not limited to telephone numbers involved in the underlying customer service interaction, but instead was broadly comprised of the various telephone numbers associated with the account in AT&T's records. *Id.* at ¶ 8.

Upon receipt of the list, computer systems within the Market Research Organization automatically identified which of the telephone numbers contained in the list were assigned to cellular telephone service and removed any non-cellular numbers from the list via SQL processing. *Id.* at ¶ 10. If the list contained multiple cellular telephone numbers for the same qualifying account, computer code running in the Market Research Organization's system "randomly" chose one of those numbers to receive the survey messages via a random number generator. *Id.* at ¶ 11.

The Market Research Organization's computer system automatically sent the remaining list of telephone numbers to AT&T's vendor, Message Broadcast, on a roughly hourly basis, ███ ███████████████████████████████████████████████████████████. *Id.* at ¶ 12. This entire process was done via computer programs without any human intervention. *Id.*

Message Broadcast's computer system stored that list of telephone numbers to be called within a database known as the "Reporting Database." *Id.* at ¶ 13. Along with the list of telephone numbers to be called, the Reporting Database also stored pre-programmed messages (previously drafted by AT&T) to be transmitted to those telephone numbers, including an initial Introductory Message, the first survey question, and various Additional Messages if any response is received, including: two more survey questions, canned replies to any responses received to the survey questions (e.g. "great!" or "sorry to hear,") a solicitation for additional comments, and a closing

message advertising AT&T's MyAT&T smartphone application. *Id.* at ¶¶ 14-16.[4]

███████████████████████████, Message Broadcast's computer systems were programmed to send the Introductory Message and First Survey Question to each telephone numbers in the list, and to send various Additional Messages if the computer detected a response. *Id.* at ¶ 27. In order to send the Additional Messages, Message Broadcast's computer system "reads" any responses to its text messages via an automated process called "natural language processing," and determines how to respond pursuant to the coded instructions provided by AT&T. *Id.* at ¶ 24. If the computer determines that it has received a response, it automatically sends an Additional Text Message without any human intervention. *Id.* at ¶¶ 25-26. In other words, there was no person responding to Plaintiff's or the putative class' texts.

In order to send one of these text messages, Message Broadcast's computer system pulls both the telephone numbers to be called and the appropriate pre-scripted messages that correspond to those telephone numbers from the Reporting Database according to the programmed instructions, and packages them together along with in originating "Short Code," which serves as the sender's address. *Id.* at ¶ 18. Message Broadcast's computer systems then automatically, and without human intervention, send those message packets to █████████████████████████████ ████████████████████████████████. *Id.* at ¶ 19.

████████████████████████ performs several automated tasks before delivering the messages: it determines whether the recipient telephone numbers are valid, it identifies the carrier networks servicing the recipient telephone numbers so that they can be delivered, and it manages

---

[4] One of the reasons AT&T decided to conduct surveys via text message was that it gave AT&T the opportunity to invite the recipient to download the MyAT&T smartphone application. *Id.* at ¶ 3. AT&T wanted its customers to use the MyAT&T smartphone app because it allowed them to "self-serve" their customer service issues and allowed AT&T to move more of its customer service interactions online, rather than to a call center. *Id.* at ¶ 4.

and throttles the automated text message transmission rate to ensure that the automated text messages do not overload the carriers' systems, thus controlling the timing at which the survey text messages are delivered to the recipients. *Id.* at ¶ 20. ████████████ connects directly to the networks of multiple carriers throughout the country and aggregates those connections to a single point used by the Message Broadcast System. This allows for *en masse* delivery of the Survey text messages to multiple carrier networks using a single short code. *Id.* at ¶ 21.

It is impossible for a human being to manually transmit a text message using a short code. Text messages sent via a short code can only be sent by computer equipment; otherwise, the originating address of the mobile-terminated text messages would appear as a standard 10-digit cellular telephone number. *Id.* at ¶¶ 22-23.

### III. The Statutory ATDS Definition Covers Systems that Autodial Stored Numbers

The TCPA provides that "[t]he term "automatic telephone dialing system" means equipment which has the capacity-

> (A) to store **or** produce telephone numbers to be called, using a random or sequential number generator; and
> (B) to dial such numbers."

47 U.S.C. 227(a)(1) (emphasis added). Given the disjunctive "or," an ATDS need not have the capacity to produce telephone numbers at all. A system that *stores* telephone numbers to be called and automatically dials those numbers falls within this statutory definition.[5] *Marks v. Crunch San*

---

[5] "[T]ext messages to a cellular phone constitute 'calls' within the purview of § 227(b)(1)(A)(iii)." *Blow*, 855 F.3d at 798, citing *Campbell-Ewald v. Gomez*, 136 S. Ct. 663, 667 (2016).

*Diego, LLC*, 2018 U.S App. LEXIS 26883, *27 (9th Cir. September 20, 2018); *see also Heard v. Nationstar Mortg. LLC*, 2018 U.S. Dist. LEXIS 143175, *14-16 (N.D. Ala. August 22, 2018).

The phrase "using a random or sequential number generator" modifies only the verb "produce," not the verb "store. Thus, an ATDS need not have the capacity to use a random or sequential number generator if it stores telephone numbers and automatically dials them. The Ninth Circuit reached this conclusion in *Marks*, upon considering a dialing system that, like the system at issue in this case, automatically sends text messages "to a list of stored telephone numbers." *Id.* at *16-17.[6] The court rejected the argument, which AT&T makes here, that an ATDS must have the capacity to use a random or sequential number generator, and held:

> "we conclude that the statutory definition of ATDS is not limited to devices with the capacity to call numbers produced by a 'random or sequential number generator,' but also includes devices with the capacity to dial stored numbers automatically. Accordingly, we read § 227(a)(1) to provide that the term automatic telephone dialing system means equipment which has the capacity—(1) to store numbers to be called or (2) to produce numbers to be called, using a random or sequential number generator—and to dial such numbers"

*Id.* at * 25-26. [7]

In reaching this conclusion, the Ninth Circuit considered both the plain language of the

---

[6] In many ways, the system at issue in *Marks* was far less automated than the system at issue here. As described by the court:
> "When Crunch wants to send a text message to its current or prospective customers, a Crunch employee logs into the Textmunication system, selects the recipient phone numbers, generates the content of the message, and selects the date and time for the message to be sent. The Textmunication system will then automatically send the text messages to the selected phone numbers at the appointed time."
*Id.* at 17. In AT&T's system, however, all of these processes are pre-programmed and run automatically by computer systems executing the code. *CSMF* at ¶¶ 7-16.

[7] A normal smartphone would not satisfy either option because the equipment would not have the capacity to *itself* dial telephone numbers automatically. A smartphone requires a user to dial a telephone number; it does not itself dial lists of stored telephone numbers in an automated fashion.

definition and other provisions of the TCPA indicating that list based systems (i.e. stored number systems) were regulated by the statute. First, the statute *exempts* from the ATDS prohibition calls "made solely to collect a debt owed to or guaranteed by the United States." 47 U.S.C. § 227(b)(1)(A)(iii). Debt collectors do not go about their business by calling random telephone numbers; they call specific telephone numbers using list-based systems. It would make little sense to provide an exemption to the ATDS prohibition for debt collection calls on behalf of the government if the calls are not even regulated in the first place. Thus, as held by *Marks*, "this debt collection exception demonstrates that equipment that dials from a list of individuals who owe a debt to the United States is still an ATDS but is exempted from the TCPA's strictures." *Marks*, 2018 U.S App. LEXIS 26883 at *24.[8]

Moreover, by enacting this exemption on November 2, 2015, Congress ratified the prevailing construction of the statute at that time, which was that it governed list-based systems.[9] *See Cent. Bank, N.A. v. First Interstate Bank, N.A.*, 511 U.S. 164, 185 (1994) ("When Congress reenacts statutory language that has been given a consistent judicial construction, we often adhere to that construction in interpreting the reenacted statutory language.") As *Marks* held, "Because we infer that Congress was aware of the existing definition of ATDS, its decision not to amend the statutory definition of ATDS to overrule the FCC's interpretation suggests Congress gave the interpretation its tacit approval." *Marks*, 2018 U.S App. LEXIS 26883 at *25.

---

[8]      Prior to the *Marks* decision, a case in this district, *Pinkus v. Sirius XM Radio, Inc.*, 2018 U.S. Dist. LEXIS 125043 (N.D. Ill. 2018), had rejected this argument regarding the government debt collection exemption, but its rejection was unreasoned. Its only retort to the argument was "That may well be true. But it does not change the fact that the best reading of 47 U.S.C. § 227(a)(1) requires that an ATDS have the capacity to generate numbers randomly or sequentially and then to dial them, even if that capacity is not deployed for practical reasons." *Pinkus*, 2018 U.S. Dist. LEXIS 125043 at *32. Plaintiff respectfully submits that this is not persuasive reasoning.

[9]      *See Infra*.

Second, the TCPA provides a defense to ATDS calls to cellular telephone numbers - "prior express consent". 47 U.S.C. § 227(b)(1)(A). This provision serves little purpose if the only systems regulated by the ATDS provision are those that dial random or sequential telephone numbers. Users of those systems would have no meaningful way of ensuring that they only called numbers for which they had consent. Indeed, the only way to attempt to do that is to *use a list*. As held by *Marks*, "to take advantage of this permitted use, an autodialer would have to dial from a list of phone numbers of persons who had consented to such calls, rather than merely dialing a block of random or sequential numbers." *Marks*, 2018 U.S App. LEXIS 26883 at *24.[10]

Beyond the statutory text, the legislative history also shows that Congress intended to regulate list or database based dialing systems. House Report 103-317 provides:

> "While some telemarketing businesses still rely on telephone directories, printed lists of prospective customers, and manual operations, the number of such businesses is dwindling. Today, computers assist an estimated 82 percent of America's businesses conducting telemarketing campaigns. And computer assistance goes far beyond dialing the telephone number of the prospective customer and transferring the call to the next available telemarketing service representative. **The entire sales to service marketing function has been automated. Modern telemarketing software organizes information on current and prospective clients into databases designed to support businesses in every aspect of telephone sales-all with the objective of bringing the company's product or service to the customer most likely to purchase it**.
>
> In addition, a separate market exists to **develop and enhance telemarketing databases**. **Hundreds of companies sell customized and off-the-self software for data base applications within mainframe, mini and personal computer environments. Their telemarketing software products are designed to meet the needs of any size business.** A leading vendor of PC-based telemarketing software, for example, has sold roughly 80,000 copies of its product-over half the copies were sold to one-person businesses.

---

[10] *Pinkus* rejected this argument because "it is possible to imagine a device that both has the capacity to generate numbers randomly or sequentially and can be programmed to avoid dialing certain numbers, including numbers that belong to customers who have not consented to receive calls from a particular marketer." *Pinkus*, 2018 U.S. Dist. LEXIS 125043 at *31-32. The irony is that the court is of course describing a *list-based dialing system*. If you are limiting your calls only to specific sets of stored numbers, you are using a list. *See Marks*, 2018 U.S. App. LEXIS 26883 at *24, n.7

> Another market exists for companies that specialize in maintaining demographic and psychographic databases designed to provide businesses with a wealth of personal and life-style data on as many as 50 or 60 million people. **Businesses routinely purchase data from multiple sources in an effort to create unique product- or service specific databases. And, the databases can be developed from multiple starting points**: a name, address, or telephone number; a drivers license number or license plate; or a personal check or credit card number.
>
> . . .
>
> In addition, industry periodicals include information and advice designed to help businesses develop telemarketing capabilities and tools, **including sophisticated databases**. As an adjunct to professional journals and other literature, the Direct Marketing .Association also offers instructional video and audio tapes, and conference proceedings, at nominal fees. Topics identified in the .Association's catalogue include: Database Management and the Privacy Issues; Merge/Purge Methodologies-**Database Marketing** Correlations; A Marketing Managers Primer to **Database Marketing**; How to Use Outside Databases Effectively; and numerous industry-specific **database marketing** tapes.
>
> Although the introduction of the computer has greatly increased the effectiveness and efficiency of telephone marketing, **modern telemarketing techniques and equipment do not guarantee the emergence of ethical, unintrusive telephone solicitation practices**.

House Report 102-317, 1st Sess. pp. 7-8 (emphasis added).  Congress was thus concerned about the use of list-based autodialers even in 1991.  It therefore drafted the ATDS definition to cover systems that *either* store *or* produce telephone numbers to be called.

Congress's concern with both types of dialing systems is well justified – regardless, of whether the numbers are generated out of thin air or simply stored in the system, the impact on the recipients of automated calls are the same.  Since there is no human being dialing the phone, the recipient is forced to deal with a machine that cannot adequately respond to his or her needs. *See Soppet v. Enhanced Recovery Co., LLC*, 679 F.3d 637, 639 (7th Cir. 2012) ("A human being who called Cell Number would realize that Customer was no longer the subscriber. But predictive dialers lack human intelligence and, like the buckets enchanted by the Sorcerer's Apprentice, continue until stopped by their true master."); *see also CSMF* at ¶¶ 30-33 (showing how AT&T's system failed to respond to Plaintiff's questions)

Finally, interpreting the definition to always require the use of a random or sequential number generator as AT&T suggests would render the word "store" superfluous because any number that is stored using a random or sequential number generator must logically also have been produced using a random or sequential number generator. *See Dominguez v. Yahoo, Inc.*, 629 Fed. Appx. 369, 372 n.1 (3rd Cir. 2015) ("it is unclear how a number can be stored (as opposed to produced) using a 'random or sequential number generator.'") (emphasis added). Thus, AT&T's construction of the statute is impermissible. *See United States v. Menasche*, 348 U.S. 528, 538-539, (1955) ("It is our duty to give effect, if possible, to every clause and word of a statute.")

AT&T will likely contend that this Court should reject *Marks* and adopt the conclusion of *Pinkus*. But *Pinkus* is not persuasive. *Pinkus* held that that "the comma separating 'using a random or sequential number generator' from the rest of subsection (a)(1)(A) makes it *grammatically unlikely* that the phrase modifies only 'produce' and not 'store[.]'" *Pinkus*, 2018 U.S. Dist. LEXIS 125043 at *28 (emphasis added). It looked to the "punctuation canon" of statutory construction, "under which a qualifying phrase is supposed to apply to all antecedents instead of only to the immediately preceding one where the phrase is separated from the antecedents by a comma." *Id*. *Pinkus* erred because applying the "punctuation canon" here contravenes the legislative intent as expressed in the plain language of the statute and in the legislative history. It also inconsistent with the requirement of express consent and the government debt collector exemption. As the Supreme Court held in *Chickasaw Nation v. United States*, 534 U.S. 84 (2001):

> "canons are not mandatory rules. They are guides that 'need not be conclusive.' *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 115, 149 L. Ed. 2d 234, 121 S. Ct. 1302 (2001).They are designed to help judges determine the Legislature's intent as embodied in particular statutory language. And **other circumstances evidencing congressional intent can overcome their force**. In this instance, to accept as conclusive the canons on which the Tribes rely would produce an interpretation that we conclude **would conflict with the intent** embodied in the statute Congress wrote." *Id*. at 94.

The Seventh Circuit has followed *Chickasaw* and relied on the surrounding statutory text and legislative history to overcome a statutory interpretation that would otherwise seem to be justified by application of the normal canons of statutory construction. *United States v. Natour*, 700 F.3d 962, 973 (7th Cir. 2012) ("Any violation of the canon of construction caused by the most sensible reading of the statute is otherwise supported by the history and precedents."), citing *Chickasaw*, 534 U.S. at 94. The court should reject the reasoning of *Pinkus* for the same reason here.

## IV. AT&T's System Satisfies Both Alternatives in the ATDS Definition

As shown above, the statute applies to both list based dialing systems that automatically dial stored lists of telephone numbers and to dialing systems that dial numbers produced by a random or sequential number generator. In this case, AT&T's system does both.

### A. AT&T's System Autodials Stored Lists of Telephone Numbers

AT&T's dialing system generates a list of telephone numbers to be called via automated computer processes. *CSMF* at ¶¶ 7-11. The system then stores that list of telephone numbers in the Reporting Database, alongside pre-programmed survey messages. *Id.* at ¶¶ 12-13. AT&T programmed the system to automatically, and without human intervention, send the Introductory Message and First Survey Question to each telephone numbers in the list. *Id.* at ¶ 27. In order to do that, the system pulls both the telephone numbers to be called and the appropriate pre-scripted messages that correspond to those telephone numbers from the Reporting Database, packages them together along with in originating "Short Code, and sends them to ███████████████ . *Id.* at ¶¶ 18-19. ███████████████ then automatically determines whether the recipient telephone numbers are valid, identifies the carrier networks servicing the recipient telephone numbers so that they can be delivered, and manages and throttles the automated text message transmission rate to

ensure that the automated text messages do not overload the carriers' systems, thus controlling the timing at which the survey text messages are delivered to the recipients. *Id.* at ¶ 20.

Thus, the system is an ATDS because it stores telephone numbers to be called and automatically dials those telephone numbers.

## B. AT&T's System Uses a Random Number Generator

AT&T's dialing system also uses a random number generator to produce telephone numbers to be called. As set forth above, where there are multiple cellular telephone number associated with a single account that qualifies for a survey, computer code running in the system randomly choses one of those numbers to be included on the final list via a random number generator. *Id.* at ¶ 11. The dialing system thus produces telephone numbers to be called using a random number generator.

Thus, AT&T's system satisfies both alternatives of the ATDS definition. Even if the FCC's 2003, 2008, and 2012 Orders are all invalid (they are not), the Message Broadcast system would still qualify as an ATDS.

## V. Fifteen Years of Precedent Establish that List-Based Dialing Systems are ATDSs

Pursuant to its authority granted by Congress, the FCC repeatedly interpreted the ATDS definition to apply to computer systems that automatically dial telephone numbers *from a list* instead of generating random or sequential blocks of telephone numbers. *See 2003 Order*, 18 FCC Rcd. at 14090-93; *2008 Order*, 23 FCC Rcd at 566-67; *2012 Order*, 27 FCC Rcd. at 13629 *In re Rules and Regulations Implementing the Telephone Consumer Protection Act*, 30 FCC Rcd 7961, 7971-78 (2015) ("2015 Order).

In its 2003 Order, the FCC held:

"**The statutory definition contemplates autodialing equipment that either stores or produces numbers**. It is clear from the statutory language and the legislative history that Congress anticipated that the FCC, under its TCPA rulemaking authority, might need to consider changes in technologies.  In the past, telemarketers may have used dialing equipment to create and dial 10-digit telephone numbers arbitrarily. As one commenter points out, the evolution of the teleservices industry has progressed to the point where using lists of numbers is far more cost effective.  The basic function of such equipment, however, has not changed--the capacity to dial numbers without human intervention.  We fully expect automated dialing technology to continue to develop.

….[T]o exclude from these restrictions equipment that use predictive dialing software from the definition of 'automated telephone dialing equipment' simply because it relies on a given set of numbers would lead to an unintended result . . . We believe the purpose of the requirement that equipment have the 'capacity to store or produce telephone numbers to be called' is to ensure that the prohibition on autodialed calls not be circumvented."

*2003 Order*, 18 FCC Rcd. at 14090-93.  The FCC thereafter affirmed in both its 2008 Order and 2012 Order that list-based dialing systems are ATDSs even where they don't use random or sequential number generators. *See 2008 Order*, 23 FCC Rcd. at 566-67; *2012 Order*, 27 FCC Rcd. at 13629.

Thus, the Seventh Circuit cited to these FCC rulings in holding that list-based dialing systems are ATDSs. In *Blow v. Bijora*, 855 F.3d 793 (7th Cir. 2017), the Seventh Circuit considered an automated text messaging system that, like AT&T's system, used a stored list of telephone numbers. *Id.* at 801 (the vendor "obtained a spreadsheet of customer phone numbers from Akira and imported those numbers into its system.")  Just like AT&T's system, the system at issue in *Blow* "us[ed] technology to 'push' the texts to an aggregator that sends the messages out simultaneously to hundreds or thousands of cell phone users at a predetermined date or time." *Id.* at 802.  The court ruled that the random or sequential number generation was not required because the system dialed the numbers from a database of stored numbers. *Id.* at 800-802, citing 2003, 2008, and 2012 Orders.

Courts across the country have reached the same conclusion. *See e.g. Legg v. Voice Media Group, Inc.*, 20 F. Supp. 3d 1370, 1375 (S.D. Fla. 2014) ("Courts have found equipment to qualify as an ATDS if it can dial numbers automatically, for example by calling or sending text messages to numbers in a pre-programmed list, irrespective of the presence of a random or sequential number generator."); *Griffith v. Consumer Portfolio Serv., Inc.*, 838 F. Supp. 2d 723, 727 (ND. Ill. 2011).

## VI.     *ACA International* **Did not Vacate all of the FCC's Prior Orders**

The sole basis for AT&T's summary judgment motion is its contention that *ACA Int'l v. FCC*, 885 F.3d 687 (D.C. Cir. 2018) -- a challenge to a 2015 FCC order[11] somehow vacated all the FCC's prior orders in addition to the 2015 Order before it.  Although the Ninth Circuit in *Marks* did find the prior FCC Orders vacated, Plaintiff contends that it is likely the Seventh Circuit will find the prior orders still binding based on the Seventh Circuit's strong deference to the *Hobbs Act* in TCPA cases before it. *See CE Design, Ltd. v. Prism Bus. Media, Inc.*, 606 F.3d 443, 447-48 (7th Cir. 2010); *Blow supra.*

In any event, *ACA* expressly limits its application to the 2015 Order only.  Underlying that limited scope is the Hobbs Act's jurisdictional bar.  The Hobbs Act provides that "[t]he court of appeals . . . has exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of . . .  all final orders of the Federal Communications Commission[.]" 28 U.S.C. § 2342.  It continues:  "**Jurisdiction is invoked** by filing a petition **as provided by** section 2344 of this title [28 USCS § 2344]." Id. (emphasis added).  That section, in turn, provides that "[a]ny party aggrieved by [a] final order may, **within 60 days after its entry**, file a petition to

---

[11]     *See In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 30 FCC Rcd. 7961 (July 10, 2015) ("2015 Order")

review the order in the court of appeals wherein venue lies." 28 U.S.C. § 2344 (emphasis added).

"This sixty-day time limit is **jurisdictional in nature and may not be enlarged or altered by the courts**." *Illinois C. G. R. Co. v. Interstate Commerce Com.*, 720 F.2d 958, 960 (7th Cir. 1983) (emphasis added), citing *Natural Res. Def. Council v. NRC*, 215 U.S. App. D.C. 32, 666 F.2d 595, 602 (D.C. Cir. 1981)).

Because neither the 2003, 2008, nor 2012 Orders were appealed through this procedure, the D.C. Circuit did not have jurisdiction in *ACA Int'l* to "enjoin, set aside, suspend (in whole or in part), or to determine the validity of" the 2003, 2008, or 2012 Orders under the express provisions of the Hobbs Act. Thus, the court specifically limited its review to the 2015 Order only:

> "Under the Administrative Procedure Act, we assess whether the Commission's challenged actions **in its 2015 order** were 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *ACA Int'l*, 885 F.3d at 694 (emphasis added).

Indeed, the D.C. Circuit never even mentions the 2012 Order[12] and, as shown further below, its references the 2003 and 2008 orders as background only. It never purports to invalidate them. *See Reyes v. BCA Fin. Servs.*, 2018 U.S. Dist. LEXIS 80690, *32-33 (S.D. Fla. 2018) ("nowhere in the D.C. Circuit's opinion are the prior FCC orders overruled. Indeed, that would have been *impossible* given that the time to appeal those orders had long passed.") (emphasis added).

Jurisdictional issues aside, AT&T's contention that *ACA Int'l* vacated the FCC's prior orders cannot be squared with the express language of the opinion. Although many courts have accordingly rejected AT&T's contention, some have agreed. Since there is disagreement, it is

---

[12] The 2012 Order provides that "the scope of [the ATDS] definition encompasses 'hardware [that], when paired with certain software, has the capacity to store or produce numbers and dial those numbers at random, in sequential order, or from a database of numbers.'" *2012 Order*, 27 FCC Rcd. at 15392 ¶ 2 n.5.

essential to look carefully at the D.C. Circuit's own statements about the petition before it, the scope of its inquiry, and its specific holdings.

The D.C. Circuit thoroughly explained both the scope of the petition and the scope of its inquiry. *ACA Int'l v. FCC*, 885 F.3d 687, 691-95 (D.C. Cir. 2018). In doing so, the court refers to the 2015 Order only. At no point does the court state that the petitioners sought to challenge any prior FCC order and at no point does the court state that it will be addressing those prior orders:

> "In this case, a number of regulated entities seek **review of a 2015 order** in which the Commission sought to clarify various aspects of the TCPA's general bar against using automated dialing devices to make uninvited calls . . . Petitioners and intervenors seek **review of four aspects of the Commission's order [singular]** . . . We will take up the challenges to those four aspects of **the Commission's 2015 ruling**[.] *Id.* at 691-94 (emphasis and notation added).

The court explains how the 2015 Order itself addresses two separate issues concerning ATDSs: the issue of "capacity" and the separate issue functionality, i.e., "the precise functions that a device must have the capacity to perform to be considered an ATDS." *Id.* at 693-94 ("In a **Declaratory Ruling and Order [singular] issued in 2015**, the Commission" addressed both issues) (emphasis and notation added).

Before moving to the merits, the court then explains the standard of review and previews its ultimate opinion. Here too it refers only to the 2015 order:

> "Under the Administrative Procedure Act, we assess whether the Commission's challenged actions **in its 2015 order** were 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' 5 U.S.C. § 706(2)(A) . . . Applying those standards to petitioners' four sets of challenges **to the Commission's 2015 Declaratory Ruling**, we set aside the Commission's explanation of which devices qualify as an ATDS . . ." *Id.* at 694-95 (emphasis added).

Addressing the merits, the court begins with the 2015 Order's treatment of the "capacity" issue. As summarized by the court, the 2015 Order held that "that the 'capacity' of calling equipment "includes its potential functionalities" or "future possibility," not just its "present

ability." *Id.* at 695, citing *2015 Order*, at 7974 ¶ 16, 7975 ¶ 20. In the court's view, this interpretation of "capacity" was "an unreasonably, and impermissibly, expansive one." *Id.* at 700. Of particular concern was that the "expansive interpretation of 'capacity' ha[d] the apparent effect of embracing any and all smartphones: the device routinely used by the vast majority of citizens to make calls and send messages (and for many people, the sole phone equipment they own)." *Id.* at 696. As the court explained, "If a device's 'capacity' includes functions that could be added through app downloads and software additions, and if smartphone apps can introduce ATDS functionality into the device, it follows that all smartphones, under the Commission's approach, meet the statutory definition of an autodialer." *Id.* at 697. The court held that "[i]t is untenable to construe the term 'capacity' in the statutory definition of an ATDS in a manner that brings within the definition's fold the most ubiquitous type of phone equipment known, used countless times each day for routine communications by the vast majority of people in the country." *Id.* at 698.

Moving to 2015 Order's pronouncements on the "functionality" issue, the court first addressed an argument by the FCC that review *of the 2015 Order* would be impermissible as to those portions of the order that supposedly summarized the FCC's prior orders. The FCC argued in its brief that:

> "The Court lacks jurisdiction, however, over the Commission's **statements** *summarizing* its past disposition of issues addressed in prior orders that the Commission did not reconsider or reopen here." Brief for Respondents at 8, *ACA Int'l v. FCC*, No. 15-1211 (D.C. Cir. Jan 24, 2016)- *FCC Response Brief* at p. 8 (emphasis added).

The court rejected this argument, not because it found that it had jurisdiction to review the prior orders themselves, but because it had jurisdiction to review the statements *in the 2015 Order*, even if they *purported to summarize* prior holdings, but are actually inconsistent with them:

> "The agency reasons that the issue was resolved in prior agency orders . . . According to the Commission, because there was no timely appeal from [the 2003 and 2008] orders, it is too late now to raise a challenge by seeking **review of a more recent declaratory ruling**

**[singular]** that essentially ratifies the previous ones. We disagree.

> While the Commission's **latest ruling [singular] purports to reaffirm** the prior orders, that does not shield the agency's pertinent pronouncements from review . . . ___The ruling [singular] is thus reviewable on both grounds___. *ACA Int'l v. FCC*, 885 F.3d 687, 703 (D.C. Cir. 2018) (emphasis and notation added)

Because the court concluded that it had jurisdiction to review "the ruling" [singular], there is no merit to the contention that the court found it had jurisdiction to review the 2003, 2008, and the unmentioned 2012 order as well. *ACA Int'l* never makes such a holding.

Indeed, both the court's discussion and ultimate holding on the functionality issue, again, refer only to the 2015 Order:

> "The role of the phrase, 'using a random or sequential number generator,' has generated substantial questions over the years. The Commission has sought to address those questions in previous orders and did so again **in the 2015 Declaratory Ruling we consider here**. The Commission's **most recent effort [singular] falls short** of reasoned decisionmaking . . . *Id.* at 701 (emphasis and notation added)

As the court explained, *the 2015 order*, not any prior FCC Order, fell short of reasoned decisionmaking because it was *internally inconsistent* on the functionality issue:

> "A basic question raised by the statutory definition is whether a device must itself have the ability to generate random or sequential telephone numbers to be dialed . . . **The Commission's ruling [singular]** appears to be of two minds on the issue. In certain respects, **the order [singular]** conveys that equipment needs to have the ability to generate random or sequential numbers that it can then dial . . .
>
> While **the 2015 ruling** indicates in certain places that a device must be able to generate and dial random or sequential numbers to meet the TCPA's definition of an autodialer, it also suggests a competing view: that equipment can meet the statutory definition even if it lacks that capacity . . .
>
> So which is it: does a device qualify as an ATDS only if it can generate random or sequential numbers to be dialed, or can it so qualify even if it lacks that capacity? **The 2015 ruling**, while speaking to the question in several ways, gives no clear answer (and in fact seems to give both answers). __It might be permissible for the Commission to adopt either interpretation__. But the Commission cannot, consistent with reasoned decisionmaking, espouse both competing interpretations **in the same order [singular]** . . .
>
> The uncertainty **in the 2015 ruling**, moreover, does not stop with the question of whether a device must be able to generate random or sequential numbers to meet the statutory definition. The ruling is also unclear about whether certain other referenced capabilities are necessary for a dialer to qualify as an ATDS. *Id.* at 701-03 (emphasis and notations added).

Finally, the court concluded its discussion by, again, referring only to the 2015 Order:

> "In short, the Commission's **ruling [singular]**, in describing the functions a device must perform to qualify as an autodialer, fails to satisfy the requirement of reasoned decision making. The **order's [singular]** lack of clarity about which functions qualify a device as an autodialer compounds the unreasonableness of the Commission's expansive understanding of when a device has the 'capacity' to perform the necessary functions. We must therefore set aside the Commission's **treatment [singular]** of those matters." *ACA Int'l v. FCC*, 885 F.3d 687, 703 (D.C. Cir. 2018) (emphasis and notation added).

Thus, AT&T's interpretation of the *ACA Int'l* opinion cannot be squared with its plain language. *Reyes* was right: "nowhere in the D.C. Circuit's opinion are the prior FCC orders overruled." *Reyes*, 2018 U.S. Dist. LEXIS 80690 at *32-33.

### A. *ACA Int'l* Did not Reject Plaintiff's Interpretation of the Statute

*ACA Int'l* found that the 2015 Order is both internally inconsistent and inconsistent with the FCC's prior orders. Indeed, this inconsistency is the sole reason that the D.C. Circuit vacated the 2015 Order's pronouncements on functionality. *ACA Int'l*, 885 F.3d at 703 ("the Commission cannot, consistent with reasoned decisionmaking, espouse both competing interpretations in the same order"). Given that the 2015 Order "appears to be of two minds on the issue" (*ACA Int'l*, 885 F.3d at 701), certain statements in the 2015 Order conflict with the FCC's prior orders. Those statements in the 2015 Order seemed to suggest that an ATDS must have "the ability to generate and then dial 'random or sequential numbers,'" rather than merely dial numbers from a list. *Id.* at 705. Yet, as *ACA Int'l* found (*id.* at 702), that pronouncement is inconsistent with the FCC's prior orders. *See 2003 Order*, 18 FCC Rcd. 14014, 2003 FCC LEXIS 3673 at *208-09; *2008 Order*, 23 FCC Rcd. 559 at 566-67; *2012 Order*, 27 FCC Rcd. 13615 at 13629.

*ACA Int'l* thus vacated the 2015 Order to set aside the inconsistencies it found therein. As AT&T acknowledges, the court found no flaw in the interpretation of the statute that would cover list based dialing systems. *Doc. 51 –AT&T Memo* at p. 8 ("the court again made no clear statutory

interpretation of its own. To the contrary, it stated that "it might be permissible for the Commission to adopt either interpretation."), citing *ACA Int'l*, 885 F.3d at 703.

**VII.    The Most Persuasive Authority Rejects AT&T's Interpretation of *ACA Int'l***

Many courts that have considered this issue have rejected AT&T's argument. *See Ramos v. Hopele of Fort Lauderdale, LLC*, 2018 U.S. Dist. LEXIS 139947 (S.D. Fla. 2018) ("The ACA decision does not affect the definition of an ATDS as set forth in the FCC's 2003, 2008, or 2012 Orders."); *Ammons v. Ally Fin.*, 2018 U.S. Dist. LEXIS 108588, *17-18 (M.D. Tenn. 2018) ("In the wake of ACA International, this Court joins the growing number of other courts that continue to rely on the interpretation of § 227(a)(1) set forth in prior FCC rulings."); *Reyes*, 2018 U.S. Dist. LEXIS 80690 at *32 ("[defendant] reads too much into ACA International when it concludes that the prior FCC orders can no longer be relied upon"); *Maddox v. CBE Grp.*, 2018 U.S. Dist. LEXIS 88568, *10 (N.D. Ga. 2018) ("Given the ACA Int'l decision, the Court relies on the FCC's 2003 interpretation of§ 227(a)(1) to determine if Defendant's system qualifies as an ATDS."); *McMillion v. Rash Curtis & Assocs.*, 2018 U.S. Dist. LEXIS 101700, *7 (N.D. Cal. 2018) ("ACA International . . . does not itself constitute a change in the controlling law . . . ACA International invalidated only the 2015 FCC Order—the court discusses but does not rule on the validity of the 2003 FCC Order or the 2008 FCC Order."); *Swaney v. Regions Bank*, 2018 U.S. Dist. LEXIS 85217, *3 (N.D. Ala. 2018) ("In its 2003 Order, the FCC concluded that the defining characteristic of an ATDS is 'the capacity to dial numbers without human intervention.' In light of ACA International, that proposition still stands.") (internal citations omitted); *O'Shea v. Am. Solar Sol.*, 2018 U.S. Dist. LEXIS 110402, * 5 (S.D. Cal. 2018) ("The ACA decision left intact the holding of both the FCC's 2003 and 2008 Order"); *Pieterson v. Wells Fargo Bank, N.A.*, 2018 U.S. Dist. LEXIS 113125, *9 (N.D. Cal. 2018) ("ACA Int'l vacated the 2015 Declaratory Ruling but it did

not clearly intend to disturb the FCC's 2003 and 2008 orders.")

The cases cited by AT&T are unpersuasive for several reasons. First, *Marshall v. CBE Group, Inc.*, 2018 U.S. Dist. LEXIS 55223 (D. Nev. 2018) misreads *ACA Int'l* as "explicitly reject[ing]" the FCC's prior interpretations on functionality, when in fact the court does the opposite. According to *Marshall*,

> "[the FCC's prior orders] found that an ATDS could include technology that dials from 'a fixed set of numbers,' rather than only systems that have the capacity to dial randomly or sequentially. As discussed supra, the D.C. Circuit explicitly rejected this "expansive" interpretation of the TCPA"

*Id.* at *17. Yet *ACA Int'l* never held that the FCC's prior orders on list based dialing systems were improperly "expansive." The opinion uses the term "expansive" only in reference to the 2015 Order's treatment of "capacity."[13] And as for the functionality issue, *ACA Int'l* expressly found that the FCC's prior interpretations "might be permissible." *ACA Int'l*, 885 F.3d at 703

Second, *Marshall* does not help AT&T's position because the court ultimately applied the "human intervention" test set forth in the FCC's prior orders anyway. It concluded that the dialing system at issue there was a manual dialing system that could not dial telephone numbers without human intervention. *Marshall*, 2018 U.S. Dist. LEXIS 55223 at *17-19. Here there was no human intervention. Of course, it is inconsistent for AT&T to rely on a case that uses the human intervention test since that test comes from the FCC orders that AT&T contends are vacated.. Thus, Marshall does not support AT&T's invitation for the Court to reject that test here.

*Herrick v. GoDaddy.com, LLC*, 2018 U.S. Dist. LEXIS 83744 (D. Ariz. 2018) does not help AT&T for the same reason. That case in fact adopts and applies the "human intervention"

---

[13]     *See Reyes*, 2018 U.S. Dist. LEXIS 80690, *32-33 (S.D. Fla. 2018) ("when the D.C. Circuit said that the FCC had provided too expansive an interpretation of the TCPA, the D.C. Circuit was not referring to the prior or recent rulings equating predictive dialers to ATDSs. Rather, the D.C. Circuit was referring to the FCC's interpretation of the TCPA as encompassing devices that have both the present and future capacity to acts as ATDSs.")

test, *Id.* at *22 ("because the FCC's prior interpretations and pronouncements regarding the 'basic function' of an autodialer (1) 'make sense'; (2) are in accordance with the treatment of this issue by courts in the Ninth Circuit; and (3) are otherwise consistent with a reasonable interpretation of the statute, the Court finds that a device will only constitute an ATDS if it can dial numbers (or send text messages) 'without human intervention.'")

*Sessions v. Barclays Bank Del.*, 2018 U.S. Dist. LEXIS 108453 (N.D. Ga. 2018) is unpersuasive because the court misconstrues ACA's language regarding the scope of its jurisdiction and review.  According to *Sessions*, *ACA Int'l* "held that the FCC's prior ruling**s** were reviewable on two grounds," (*id.* at *10-11 (emphasis added)) when in fact, *ACA Int'l* held that "[t]he ruling [singular] is thus reviewable on both grounds," referring only to the 2015 Order. *ACA Int'l*, 885 F.3d at 687.

Finally, although not cited by AT&T, Plaintiff submits that *Pinkus, Inc.*, 2018 U.S. Dist. LEXIS 125043 is equally unpersuasive.  *Pinkus* acknowledges that *ACA Int'l* did not affirmatively conclude the FCC"s prior orders on functionality were wrong. *Id.* at *14-15. And it acknowledges that *ACA Int'l* was instead concerned only with the *inconsistencies* in the 2015 Order on functionality. *Id.* at * 16-17.  *Pinkus* errs, however, by concluding that the FCC's prior orders are "necessarily" vacated as well because similar inconsistencies are "equally present" in the 2003 and 2008 Orders.[14] *Id.* at *22-23.  *Pinkus* held that "ACA International's concern [about] the agency's 'lack of clarity' . . .  thus applies with equal force to the [prior orders]." *Id.* at 20-21.  In other words, *Pinkus* adopted the reasoning of *ACA Int'l*, and attempted to apply it to the 2003 and 2008 Orders. This is improper and unpersuasive.

First, *Pinkus* is wrong that there are similar inconsistences in the 2003 and 2008 orders.

---

[14] Note that *Pinkus* never mentions the 2012 Order.

*ACA Int'l*, in fact, never made such a finding. Every reference that *ACA Int'l* makes on the point is to the 2015 Order alone. *See e.g.*, *ACA Int'l*, 885 F.3d at 701 ("The Commission's most recent effort falls short of reasoned decisionmaking . . ."); *id.* at 702-03 ("The 2015 ruling, while speaking to the question in several ways, gives no clear answer (and in fact seems to give both answers); id. at 703 ("the uncertainty in the 2015 ruling . . .")

Second, as there is no specific ruling in *ACA Int'l* that the prior orders are inconsistent and therefore invalid, *Pinkus* exceeded its jurisdiction by independently determining the validity of the 2003 and 2008 Orders because any such finding is prevented by the *Hobbs Act*. *See CE Design*, 606 at 448. This Court should not do the same here.

Thus, the FCC's prior orders are still valid. AT&T's system is an ATDS under the FCC's binding interpretation of the statute.

## VIII. Conclusion

The Court should deny AT&T's Motion for Summary Judgment and grant Plaintiff's Motion for Partial Summary Judgment.

Respectfully submitted,

By: /s/ Timothy J. Sostrin

Keith J. Keogh
Timothy Sostrin
Keogh Law, Ltd.
55 W. Monroe St., Ste. 3390
Chicago, IL 60603
312.726.1092 (office)
312.726.1093 (fax)
TSostrin@KeoghLaw.com

*Attorneys for Plaintiff*